### THE STATE OF KANSAS v. PETER MUGLER.

BEER, *Making and Selling*—*Public Offense.* In 1877, the defendant erected a brewery, and has since operated the same in manufacturing beer, an intoxicating liquor. In 1881, after the taking effect of both the constitutional amendment relating to intoxicating liquors, and the present prohibitory liquor act, (Laws of 1881, ch. 128,) the defendant manufactured beer, and also sold beer without having any permit giving him any authority to do either. The sale, however, was of beer which he had manufactured prior to the taking effect of the said prohibition act. *Held,* That the said prohibition act is not unconstitutional; but that it is constitutional and valid so far as it affects the defendant; and that the defendant committed a public offense, both in the manufacture of the beer, which he manufactured after the taking effect of the prohibition act, and in the sale of the beer, which he sold after the taking effect of such act.

### Appeal from Saline District Court.

TWO ACTIONS against *Peter Mugler* for violating chapter 128, Laws of 1881. In each of these cases the defendant, at the November Term, 1881, of the district court, was found guilty, and fined $100. He appeals. The opinion states the facts.

*Garver & Bond,* for appellant:

In the case for manufacturing, we think our motion to quash the indictment should have been sustained. It is bad for duplicity, in charging the defendant at the same time with manufacturing by himself and abetting others in the manufacture. Both certainly cannot be true of the same transaction. One cannot be principal and accessory at the same time. The charge might have been so made by the use of several counts, but not otherwise.

The next, and main question in this case is, whether or not the prohibition law is constitutional in so far as it attempts to affect this defendant under the facts of this case? We say that it is not.

Years prior to the enactment of the law, and even before the prohibition amendment to the constitution was discussed,

the defendant erected his brewery and furnished it with the means necessary for the manufacture of beer, the subject of the charge in the indictment. When the amendment was adopted, and when the act for its enforcement became a law, the defendant's money was thus invested, and his brewery was his "property." The effect of the act is to close the doors of his business, and leave what had been valuable property, recognized and protected by the law, lifeless, unremunerative, and almost worthless, as it idly rests under the condemnation of the new departure. By a simple legislative edict, the defendant is stripped of $7,500 in value of property, as effectually as if consumed by fire. In this he is deprived of property without due process of law, in violation of fundamental principles of government, and of the fourteenth article of the amendment to the constitution of the United States, which provides: "Nor shall any state deprive any person of life, liberty, or property, without due process of law." We recognize the fact, "that a state law prohibiting the manufacture and sale of intoxicating liquors for use as a beverage is not repugnant to any clause of the United States constitution," as decided in *Bartemeyer v. Iowa*, 18 Wall. 129, and followed by this court in the *Prohibitory-Amendment Cases*, 24 Kas. 722, provided the law does not disturb vested rights, and operates only upon the future acquisition of such property.

We need merely affirm that a brewery, or the beer manufactured therein, is property. No argument is called for to maintain a proposition so self-evident. Neither can it be said that depriving one of the use of his property merely does not deprive him of his property within the meaning of the constitution. Property rights are so blended with the right of use and enjoyment that we can scarcely conceive of the existence of the one without the other. The latter inheres naturally and necessarily in the former. What a barren gift it would be, and how cold the charity, to present one with valuable estates, burdened with the condition that the donee should not use them. Such conditions the law pro-

nounces void, because inconsistent with the estate granted, and because the right to use and enjoy follows and belongs to the right of property. Field, J., in *Bartemeyer v. Iowa,* said:

"The right of property in an article involves the power to sell and dispose of such article,.as well as to use and enjoy it. Any act which declares that the owner shall neither sell it nor dispose of it, nor use and enjoy it, confiscates it, depriving him of his property, without due process of law."

So in *Pumpelly v. Green Bay Company,* 13 Wall. 177, Miller, J., delivering the opinion of the court, said:

"It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can in effect subject it to total destruction without making any compensation, because, in the narrowest sense of the word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private rights under the pretext of public good, which had no warrant in the laws or practices of our ancestors."

Reaffirming this proposition, Field, J., in *Munn v. Illinois,* 94 U. S. 141, used this language:

"All that is beneficial in property arises from its use, and the fruits of that use; and whatever deprives a person of them, deprives him of all that is desirable or valuable in the title and possession. If the constitutional guaranty extends no further than to prevent a deprivation of title and possession, and allows a deprivation of use, and the fruits of that use, it does not merit the encomiums it has received."

Thus, authority and reason lead us to the same conclusions

regarding the scope and meaning of this provision of the constitution. Hence we confidently assert that the prohibition law, in prohibiting the use by defendant of his property, and affecting him as this law proposes, deprives him of his property within the contemplation of the constitution.

But it is said this is effected by a legitimate exercise of the police power of the state, and is for that reason exempted from the operation of this provision. The standing excuse for all arbitrary and oppressive acts of a legislature, when they bear grievously upon the private citizen, is, that it is for the public good — and that individual rights must give way and be made a sacrifice to secure the welfare of the many. And the police power of the state, that indefinable, and as claimed, unrestrainable authority, steps in upon all occasions as a cloak to shield and defend iniquitous laws. Restraints upon governmental authority are no modern invention. King John of England, no doubt, justified many of his infamous acts, arbitrarily destroying the rights of his subjects, under the plea that the public good, or the welfare of the kingdom, demanded it. But the people then as now, recognized the fact that certain inalienable rights existed independent of governments, and at Runnymede, nearly seven hundred years ago, the great charter was signed, in which it was guaranteed that no free person should be injured in property, unless by legal decision of his equals, or by the law of the land. From that day to this, restraints have been by the people placed upon the power of the state, not, merely in one direction, but in all. The reason and necessity therefor are not confined to any special class of subjects.

"The violence of public passion is quite as likely to be in the direction of oppression as in any other; and the necessity for bills of right in our fundamental laws lies mainly in the danger that the legislature will be influenced by temporary excitements and passions among the people to adopt oppressive enactments." (Cooley's Const. Lim. 55.)

In no respect, perhaps, is there more danger of oppressive enactments, than in the exercise of the so-called police power.

Why then should any constitutional restraint be construed and applied so as not to affect the exercise of such power? What is there to indicate that any restriction which the people have placed upon the states, is to be taken with other effect than that imported by the plain meaning of the language used? Certainly there is no limitation upon the people. They have said by the fourteenth article of amendment, that no state shall deprive any person of property without due process of law. Where does a court find authority to interpolate the words, "except in the exercise of the police power of the state?" Without such interpolation, the prohibition is general, embracing everything that may be a subject of legislation.

"Whatever may be the nature and reach of the police power of a state, it cannot be exercised over a subject confided exclusively to congress by the federal constitution. It cannot invade the domain of the national government." (*Railroad Co. v. Husen*, 95 U. S. 471.)

So, we say, it cannot be exercised over a subject—in this case depriving a person of property—except in the manner provided by the constitution.

What is the police power of the state? Upon few subjects has there been more discussion, and yet it is difficult to find a definition that is at the same time intelligible and adequate for a general rule. No doubt much of the confusion results from the attempts on the part of some courts to subdivide the power of the state as it affects its internal affairs and operates upon persons and things within its jurisdiction, so as to convey the impression that this power is confined to those subjects which are considered by everyone to be directly injurious to the public. Of such subjects are health laws, laws for the abatement of nuisances, laws against carrying concealed deadly weapons, and the like. We presume, however, that the extent of this power is almost as unlimited as the subjects of state legislation. Nearly all the general powers of the state may be brought under this head, when we understand that it is nothing more than the power to govern men and things

within the dominions of the state so as to subserve the general good. It is immaterial to this case what its scope may be, for it is admitted that within it is the power of the state to legislate against the liquor traffic. It is enough for us to know that too many things of vital importance to the people may be effected under the police power, for courts to contract the meaning of the constitution by a construction which will permit a state without restraint, and arbitrarily, to deprive a citizen of life, liberty, or property, simply because it can be said to be done by virtue of this power. The several states are likewise prohibited from doing various other things, such as enacting laws impairing the obligation of contracts, passing *ex post facto* laws, bills of attainder, laying imposts or duties on imports or exports, etc. · It will not be claimed that these and similar provisions are not obligatory upon the states in respect to those matters wherein the police power may be exercised. That they absolutely prohibit state legislation upon any subject, in violation of the expressed terms of the constitution, is well settled. And this is so, even where it is claimed that the state is acting within its ordinary police power. (*Rld. Co. v. Husen*, 95 U. S. 465; *Henderson v. Mayor of New York*, 92 id. 259; *Dodge v. Woolsey*, 18 How. 348; *The State v. Saunders*, 19 Kas. 127.)

That the state may *regulate* the manufacture and sale of liquors in such manner as to throw restraint around the business, and to cast burdens upon those having vested rights in it, is not open for discussion. This right of regulation has been recognized and held by the court in *Munn v. Illinois*, 94 U. S. 113. In holding this, however, Waite, C. J., on page 134 says: "Rights of property which have been created by the common law cannot be taken away without due process."

The distinction is simply this: The legislature may regulate the mode of enjoyment of property, provided there is left a substantial right. The prohibition law is in no sense a regulation. The title of the act characterizes it, according to the understanding of every lawyer and court, as "An act to *prohibit* the manufacture and sale." The excepted purposes

17 — 29 KAS.

will not be claimed to be a substantial right left, for clearly they are not.

Even in the absence of this constitutional protection against oppressive legislation, we might question that it is a proper exercise of the police power to absolutely prohibit the defendant from operating his brewery. The act makes no distinction between manufacturing for sale in the state and manufacturing for one's own use, or for export out of the state. The simple manufacturing of an intoxicating liquor offends no one, and the public have no right or pretense for interference. It is the excessive use, or abuse of such liquors, which causes the pauperism, misery and crime that society may protect itself against. And it is only as this abuse injuriously affects the general public that any regulation even is tolerated. The legislature is not the conservator of private morals, nor the guardian of people of other states. What right then has the state through its legislative department to say to this defendant, or to any other citizen who may be possessed of similar property, that he may not make beer for his own consumption under penalty of heavy fine or imprisonment? Or, though not a drop of liquor of his manufacture be used within the state, upon what principle is he commanded to discontinue his business?

"Under the power to regulate, the state cannot deprive the citizen of the lawful use of his property, if it does not injuriously affect or endanger others." "We are unwilling to concede the existence of an indefinable power, superior to the constitution, that may be invoked whenever the legislature may deem the public exigency may require it, by which a party may be capriciously deprived of his property or its use, without compensation, whether such property consists of franchises or tangible forms of property." (*Lake View v. Rose Hill Cem. Co.*, 70 Ill. 191.

"It is not within the power of the general assembly, under the pretense of exercising the police power of the state, to enact laws not necessary to the preservation of the health and safety of the community, that will be oppressive and burdensome upon the citizen. If it should prohibit that which is harmless in itself, or command that to be done which does not

tend to promote the health, safety, or welfare of society, it would be an unauthorized exercise of power, and it would be the duty of the courts to declare such legislation void." (*Rly. Co. v. City of Jacksonville*, 67 Ill. 37–40.)

Consonant with this principle is the following language of the learned writer of the opinion of the court in the *Intoxicating-Liquor Cases*, 25 Kas. 765–6:

"I do not think the legislature can prohibit the sale or use of any article whose sale or use involves no danger to the general public. The habits, the occupation, the food, the drink, the life of the individual, are matters of his own choice and determination, and can be abridged or changed by the majority speaking through the legislature *only when the public safety, the public health, or the public protection requires it.* . . . The constitutional guaranty of 'life, liberty, and the pursuit of happiness,' is not limited by the temporary caprice of a present majority, and can be limited only by the absolute necessities of the public."

Judged by this rule, the general prohibition against the brewers of the state cannot be sustained. If the act can be held to be constitutional as it prohibits manufacturing for sale within the state, though void otherwise, then the indictment, to be good, should charge a manufacturing with the special intent. The charge here is as broad as the act, and must stand or fall with it on this point. Hence we maintain that the prohibition act attempts to deprive the defendant of his property in such a case as falls under the protection of the fourteenth amendment. Such results, therefore, can be effected only by due process of law.

Is this by due process of law? Here again we meet a subject upon which divers opinions have been given, and it is not a little difficult to frame a general definition of the phrase. The words seem to be given the same meaning as the phrase "law of the land." (Sedg. on Stat. and Const. Law, 610.) In the same work the author says:

"Much discussion has taken place in regard to what is meant by the phrase, 'the law of the land.' Perhaps, in most respects, there is nowhere to be met with a better definition of it than is to be found in the argument of Mr. Webster, in

the Dartmouth College case: 'By the law of the land is most clearly intended the general law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of general laws which govern society. Everything which may pass under the form of an enactment is not the law of the land.'"

In *Brown v. Hummel*, 6 Barr, 87, the judge delivering the opinion of the court said:.

"By the law of the land is meant the law of an individual case, as established in a fair open trial, or an opportunity given for such trial, in open court, and by due course and process of law; not a bill of attainder, in the shape of an act of assembly, whereby a man's property is swept away from him without a hearing, trial or judgment, or the opportunity of making known his rights, or producing his evidence."

In *Hoke v. Henderson*, 4 Dev. 15, Ruffin, C. J., says:

"This clause does not mean an act of the legislature, for that construction would abrogate all restriction on legislative authority. The clause means that statutes which would deprive a citizen of the rights of person or property, without a regular trial according to the course and usage of the common law, would not be the law of the land in the sense of the constitution."

The eminent Chief Justice Gibson, in considering a similar clause in the constitution of Pennsylvania, said:

"What law? Undoubtedly a *preëxisting* rule of conduct, not an *ex post facto* rescript or decree made for the occasion. The design of the convention was to exclude arbitrary power from every branch of the government; and there would be no exclusion of it if such rescripts or decrees were to take effect in the *form of a statute*." (*Norman v. Heist*, 5 Watts & S. 171.)

Similar language we find made use of by Bronson, C. J., in *Taylor v. Porter*, 4 Hill, 145.

"The words 'law of the land,' as here used, do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense."

The words, "due process of law," used in the fifth article

of amendment to the constitution, being under consideration in *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 276, Curtis, J., delivering the opinion of the court, said:

"The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will."

Of course we do not contend that due process of law is necessarily judicial process. Administrative process, which has been regarded as necessary in all governments, and sanctioned by long usage, may in many cases be due process. What we contend for, however, as the most liberal construction the words justify, is, that rights of property must be determined by the law in its regular course of administration through courts of justice, or according to preëxisting rules and usages with reference to the particular class of rights to be affected.

The defendant is deprived of his property by mere force of the legislative decree. No rule is established, or course prescribed, by which his rights are in any way to be considered. The legislature finds him in the enjoyment of property, which public policy in this state has never even subjected to any police regulation, nor placed in any way under the surveillance of the law. It simply says to him: "This business which you have built up under the protection of the law, and which to this time has not been held to infringe upon public rights in any way, is henceforth condemned as a nuisance, and the value of your property confiscated for the public good." There is no notice, no hearing, no opportunity for redress; nothing is heard but this inexorable decree of annihilation, and the defendant sits in the midst of the

ruins of that which years of toil had accumulated, under the vain hope that he had security under the law.

Some things are nuisances *per se,* always so held and regarded, just as some acts are unlawful or wrong by reason of their very quality. Others are so, simply because the legislature has so declared. No one can claim a vested right in maintaining that which by common consent is a nuisance, and summary methods of abating it have ever been sustained. Overwhelming necessity may also often justify society in resorting to harsh and apparently arbitrary measures to protect itself from impending calamity. In this respect society acts upon principles of self-defense, much as individuals do. In averting imminent danger to life, the individual may take the life of another to save his own. Two drowning men are struggling for possession of a plank that will support but one, and the stronger is justified in thrusting his more exhausted companion into a watery grave. Is this because the law places more value upon one life than another? Certainly not. They are rather cases wherein the individual rises above the law—or more correctly speaking, we may say they are the exercise of rights in extremities, which never have been surrendered by the individual to society. "Necessity knows no law," is a saying verified by the facts of every day. Why then should it be said that the authority exercised in such exceptional cases is any precedent or justification for equally extreme acts when no such overwhelming necessity exists? Other examples of the exercise of arbitrary power by the state are of little force here, either because not similar, or because they have been exercised from immemorial time, and all constitutional provisions are consequently held as recognizing the existence of such power. There is nothing preceding the prohibition law that can be referred to as a cause or excuse for working this injury to the defendant. His brewery, as property, and his rights in operating it for the manufacture of beer, were as sacred under the law as any other right that enjoyed legal protection. Before the new depart-

ure was made in this state, the defendant's rights of property had become vested rights, and are admitted then to have existed. The legislative *fiat* goes forth, "Let them exist no longer," and the transformation is complete.

Will anyone say that the law provides for a judicial trial before such property is declared to be a nuisance, and that the manufacturer also has a hearing before he is condemned? True, there may be a trial, but for what? Not to determine whether the confiscation shall take place or not—that has been accomplished already. It is rather upon the supposition that the owners of such property may seek to avoid the effect of the law, and if possible, regain a portion of what they have been deprived of in this arbitrary manner, and the trial is instituted for an investigation of such attempt. The penalty in this case falls upon the defendant simply because he made a futile effort to recover back what the state had taken from him.

No one will seriously question the abstract justice of our position, and we think we are sustained in it by sound legal principles. In support of our argument, and for an exhaustive discussion of the question, we refer to *Wynehamer v. The People*, 13 N. Y. 378. The matter was touched on but not decided, in *Bartemeyer v. Iowa*, 18 Wall. 129, and in *Beer Co. v. Massachusetts*, 97 U. S. 25.

It follows, if our position be well taken, that the effect of the prohibition act is to deprive the defendant of his property without due process of law, and it is therefore unconstitutional and void—as to him at least.

—The principal question in case No. 2623 is the constitutional one, which we have already discussed, and the argument above made will apply to it. The prohibition act, as it affects the defendant here, deprives him of the use of beer manufactured by him prior to the enactment of the law. The decision of this case on this point will necessarily follow the former case, for as was said in *Beer Co. v. Massachusetts*, "the right to manufacture, undoubtedly . . . included the incidental right to dispose of the liquors manufactured."

Several other errors are claimed in the ruling of the court upon the motions made to the indictment. In the indictment are joined five counts for selling, and one count charging the maintenance of a nuisance. However far courts may be willing to go in allowing a joinder of counts for different offenses, we submit that they should be offenses of the same class, and subject to like penalties. The practice is prejudicial enough to a defendant at best, without confusing him by embracing not only different offenses, but different offenses of different kinds. Making an illegal sale of liquor, and maintaining a nuisance, are offenses which should not be joined. As well might a defendant in the same indictment, by several counts be charged with selling liquors, assault and battery, petit larceny, and adultery. Such an indictment would hardly be upheld.

*H. S. Cunningham,* county attorney, for The State:

The argument of appellant may be briefly stated as follows: Appellant, in common with all other citizens, native and naturalized, is by the fourteenth amendment of the constitution of the United States guaranteed certain enumerated rights, among which we find that no state shall deprive him of . . . property, without due process of law. The State of Kansas, by the enactment of the prohibitory law, (ch. 128, Laws 1881,) has deprived appellant of his property without due process of law. "Therefore said law is unconstitutional and void—as to him at least." (Brief of appellant.) We submit that the minor premise is untenable for the following reasons: 1st. For all that appears from the record, appellant still owned, controlled and used the brewery described therein at the time of the filing of the indictment as fully as he did upon May 1st, 1881. 2d. That by complying with the terms of §.5 of chapter 128, Laws 1881, he could have *lawfully* used the said brewery for the very purpose for which it was erected, viz.: "For the manufacture of beer."

We take the position taken by a majority of this court in the *Prohibitory-Amendment Cases,* 24 Kas. p. 723, that the

prohibitory amendment and the law to carry the same into effect "has simply enlarged and increased the restrictions" which had heretofore been thrown around the liquor business in this state. No man has a vested right to deal in intoxicating liquors. The business has been the subject of legislative control ever since the history of the state began. Appellant was bound to take notice of this when he engaged in the business, that it was then subject to legislative restriction; that the future restrictions to which it might be subject were only limited by the will of the people and the legislature.

But it is urged, and the record shows, that said brewery was worth the sum of $10,000 for use in the manufacture of beer, and is not worth to exceed the sum of $2,500 for any other purpose. As before suggested, why does not appellant use it for the purpose for which it was erected? He might do so lawfully if he so desired.

We submit that the decrease in value of this property, if from the record it is properly chargeable to the prohibitory law, is purely consequential injuries.

"It is also a rule that a party has no vested right to be protected from consequential injuries arising from the exercise of rights by others." (Cooley's Const. Lim., p. 384.)

The prohibitory law being the result of the proper exercise of the police power of the state, appellant cannot be heard to complain of the decrease of the value of his property. The removal of the county seat from the city of Salina to a neighboring town would decrease the value of this brewery, but that would not destroy the right of the people to have the county seat removed, nor give appellant the right to be protected from such injury if it should be removed. The vacation of the street in front of this brewery would decrease the value of this property, but that would not destroy the right of the public to have the street vacated; neither could appellant be compensated for the decrease in the value of the property. The abridgment of the already limited right to manufacture and sell intoxicating liquors in Kansas may have decreased the value of this brewery, but that can-

not destroy the right of the public, through a proper exercise of the police power of the state, to protect society from the evils resulting from the business. Nor is the appellant entitled to protection from the results of the exercise of such power by the state.

There is error in the conclusion of appellant in this: it is claimed that the prohibitory law is unconstitutional and void, as to appellant *at least*. We do not think that even a *naturalized citizen*, who, as appears at length from the record, in 1877 renounced his allegiance to a foreign potentate, and became a citizen of Kansas, can have any 'more or greater rights to minister at the altar of the god Gambrinus than the native-born citizen of the country. If this law is unconstitutional and void as to appellant, it is void as to all.

We think that the main questions involved in this case, and the true theory upon which it should be decided, have been fully settled already by this court in *The Prohibitory-Amendment Cases*, 24 Kas. 700, and the cases therein cited.

—The record shows that the beer sold in the second case was on hand prior to the date of the passage of the prohibitory law, but it is not shown to have been on hand prior to the time the prohibitory amendment went into effect. It was therefore unlawful for appellant to sell it for other than the excepted purposes mentioned in the prohibitory amendment, during any of the time he had it on hand prior to sale; so we assert that the "two grave questions" suggested by Mr. Justice Miller in *Bartemeyer v. Iowa*, 18 Wall. 133, do not arise in this case.

It is suggested that there was an improper joinder of counts in the indictments in both of the cases. Even if this were true, it would make no difference in the decision of these cases, because the appellant was required to plead to, and was tried upon, but one count in each case. No substantial right of appellant was affected by the joinder of counts.

But we think the question of practice upon the joinder of counts in cases of misdemeanor has been practically settled

by the court in a case decided since the trial of this case. (*The State v. Schweiter*, 27 Kas. 499.)

The opinion of the court was delivered by

VALENTINE, J.: The defendant, Peter Mugler, was prosecuted criminally, in two different cases, for violations of the prohibitory liquor law. In the first case, the indictment contained but one count, charging that the defendant "did unlawfully manufacture, and aid, assist and abet in the manufacture" of certain intoxicating liquors. In the second case, the indictment contained six counts, in the first five of which it charged that the defendant, on five different days, sold intoxicating liquors in violation of law; and in the sixth count it charged that the defendant was guilty of keeping and maintaining a common nuisance, by keeping for sale and selling certain intoxicating liquors. In the first case, a motion was made by the defendant to quash the indictment, for the reason that it did not state facts sufficient to constitute any offense, and because it contained a double charge against the defendant. This motion was overruled by the court. A trial was then had in the case, before the court without a jury, upon an agreed statement of facts, which admitted that the defendant, since October 1, 1881, without a permit, manufactured beer, an intoxicating liquor, in a brewery erected by him in Salina, Kansas, in 1877, and used thereafter by him as a brewery up to May 1, 1881, the time when the present prohibitory liquor law went into effect; "that said brewery was at all times after its completion, and on May 1, 1881, worth the sum of $10,000, for use in the manufacture of said beer, and is not worth to exceed the sum of $2,500 for any other purpose." It was also admitted that the defendant used his brewery for the manufacture of beer after October 1, 1881, the same as he had done prior to May 1, 1881. In the second case, motions to quash the indictment and to compel the prosecution to elect upon which count it would proceed, were made by the defendant, and were overruled by the court. A trial was then had in the second case, before

the court without a jury, upon an agreed statement of facts, which admitted that the sale charged in the first count of the indictment was made by the defendant, without a permit, and that it was a sale of beer manufactured by the defendant before the passage of the prohibitory act of 1881; but whether the beer thus sold was manufactured before the adoption of the constitutional amendment, in November, 1880, prohibiting the manufacture and sale of intoxicating liquors, except for medical, scientific and mechanical purposes, the record is silent; and for what purpose the beer was sold, the record is also silent. In each of these two cases the defendant was found guilty, and fined $100, and in each he now appeals to this court.

The principal question supposed to be involved in these two cases is as follows: Is or is not the present prohibitory liquor law constitutional, so far as it affects the defendant and his business in manufacturing beer at his brewery, and selling the same? The defendant claims that such law is unconstitutional, and his counsel make a very able and elaborate argument in this court, to show that it is unconstitutional. Among other things, they say:

"Years prior to the enactment of the law, and even before the prohibition amendment to the constitution was discussed, the defendant erected his brewery and furnished it with the means necessary for the manufacture of beer, the subject of the charge in the indictment. When the amendment was adopted, and when the act for its enforcement became a law, the defendant's money was thus invested, and his brewery was his 'property.' The effect of the act is to close the doors of his business, and leave what had been valuable property, recognized and protected by the law, lifeless, unrenumerative, and almost worthless, as it idly rests under the condemnation of the new departure. By a simple legislative edict the defendant is stripped of $7,500 in value of property, as effectually as if consumed by fire.

"In this he is deprived of property without due process of law, in violation of fundamental principles of government, and of the fourteenth article of the amendment to the constitution of the United States, which provides: 'Nor shall

any state deprive any person of life, liberty, or property, without due process of law.'"    .    .    .

"The defendant is deprived of his property by mere force of the legislative decree. No rule is established or course prescribed by which his rights are in any way to be considered. The legislature finds him in the enjoyment of property, which public policy in this state has never even subjected to any police regulation, nor placed in any way under the surveillance of the law. It simply says to him: 'This business which you have built up under the protection of the law, and which to this time has not been held to infringe upon public rights in any way, is henceforth condemned as a nuisance, and the value of your property confiscated for the public good.' There is no notice, no hearing, no opportunity for redress; nothing is heard but this inexorable decree of annihilation, and the defendant sits in 'the midst of the ruins of that which years of toil had accumulated, under the vain hope that he had security under the law."

Much that counsel say we think has force. The legislature has probably gone a long way in destroying the values of such kinds of property as the defendant owned, and has possibly gone to the utmost verge of constitutional authority. And yet we do not think that the result reached by counsel for the defendant necessarily follows from the facts and circumstances of this case. The defendant is certainly not deprived of his brewery, or of his liquor, or of any of his other tangible property. So far as the constitutional amendment and the prohibition act are concerned, he still retains his brewery and his liquors, and all his other tangible property, just the same as he did prior to the passage or adoption of any of the present restrictive or prohibitory liquor laws. But probably it is not his tangible property which he claims has thus been taken or destroyed or confiscated. It is his intangible property, his vested rights, founded upon or incidental to the rightful *enjoyment*, or *use*, of his visible and tangible property, of which he claims to have been deprived. This brings us to a comparison between the former restrictive and prohibitory liquor laws of this state, and the present restrictive and prohibitory liquor laws. In 1877, when the de-

fendant erected his brewery, he had a right to manufacture all
the beer or other intoxicating liquors which he chose; and he
can do so still, provided he first obtains a permit therefor from
the probate judge, and he can easily obtain the permit by com-
plying with the terms and conditions upon which permits are
issued.    At that time he could manufacture intoxicating
liquors for any purpose which he chose; but since the adop-
tion of the constitutional amendment, in November, 1880, he
can manufacture such liquors only for medical, scientific and
mechanical purposes.    His right to sell intoxicating liquors,
however, was always restricted.    In 1877, under the then ex-
isting laws, he had no right to sell his beer or any other intoxi-
cating liquor in any quantity, or in any place in Kansas, or
to any person, unless he had first obtained a license therefor.
(*The State v. Volmer*, 6 Kas. 371; *Dolson v. Hope*, 7 Kas. 161;
*Alexander v. O'Donnell*, 12 Kas. 608;) and such is still the
law.    The license is now called a "permit."    But even with
a license, the defendant had no right under the old laws, to
sell his beer on Sundays, or on election days, or on the
Fourths of July; or to any person who was in the habit of
becoming intoxicated against the known wishes of his wife,
child, parent, brother, or sister; or to any minor against the
consent of his parent or guardian; or at any place except the
place designated in his license, which in the present case
would have been the city of Salina.    Besides, the defendant
had no assurance under the old laws that he could procure a
license.    Licenses were not granted to anybody and every-
body, but only to a select few, and then the license would
continue in force for the period of one year only, and no
person could have any assurance that his license would be
renewed.    Both the issuing and the renewal of licenses de-
pended entirely upon the temper and disposition of the com-
munity in which the application was made.    Under the old
laws, each community was given the privilege of determining
for itself whether licenses to sell intoxicating liquors should
be issued or not, and if none were issued, then the old law
was as much a prohibition law as the present liquor law.

The old law might properly be called not only a license law, but also an option law, and a contingent prohibition law — for licenses were allowed to be issued at the option of each community; and if they were not issued the law would become a virtual prohibition law. Under the old law the entire state might have become a complete prohibition state, at the option of its several communities, or each community might have authorized the issue of licenses, as it chose. In this respect the old law and the present law differ. The old law left the question of prohibition or license with each community separately and exclusively, while the present law theoretically enforces prohibition upon all communities, whether they are willing or unwilling. We do not here wish to be understood as saying that our present liquor law, or any liquor law which we have ever had in Kansas, is or has been an absolute and unqualified prohibitory liquor law. They have none of them been more than limited and qualified prohibition laws. Under the old law, the defendant, with a license, could sell his beer to any person and to all persons, with the exceptions heretofore mentioned; but under the present law, we suppose he is subject to at least one other restriction in his sales as to persons. He cannot now sell his beer for medical purposes except to druggists. It would seem, however, that with a permit he may now sell his beer for scientific and mechanical purposes, to any and every person who might wish to purchase the same. And therefore it would seem that in this respect no additional restrictions over the old law are imposed. We think it will now appear that the old law and the new are not so vastly different as has been by some persons supposed. Both are restrictive in their character; both are criminal laws, and both are prohibitory to some extent; and yet neither is absolutely and unqualifiedly a prohibition statute. Both restrict sales as to times, places and persons, and the present law as to purposes; and yet both laws allow sales to be made. Under the old law, the defendant never had any authority to sell his beer, except with a license. He never had any positive assurance

that a license would be granted to him, or if granted, that it would be extended·or renewed; and even with a license, he could not sell his beer at any other place than at the city of Salina. And his right to sell beer for any considerable period of time was always based upon many uncertainties and contingencies. Under the present law, the defendant with a permit, which he can easily obtain, can manufacture all the beer for medical, scientific and mechanical purposes which he chooses to manufacture, and can sell the same for such purposes, provided he can find purchasers therefor. The material restrictions imposed by the present law, in addition to those imposed by the old law, are simply as to the purposes for which he may sell, and as to the persons to whom he may sell for medical purposes. There are no other material or substantial restrictions.

Under such circumstances, we hardly think that the defendant had such a vested interest in the old law, or in anything else, as would prevent the passage of a law like our present prohibition act. It would hardly seem that the defendant, by erecting a brewery in 1877, and by operating it for some time afterward, could obtain such a vested interest in anything as to prevent further legislation with respect to intoxicating liquors, of a more restrictive and stringent character; or that he could go on, with or without legislation, and with or without a license, manufacturing and selling beer forever. We suppose that the defendant founds his right to continue to manufacture and sell beer solely and exclusively upon his supposed vested right to operate his brewery in undisturbed tranquility forever. He certainly will not claim that, independent of his brewery, he had a vested right at the time the constitutional amendment was adopted, or at the time the present prohibition law was enacted, to either manufacture or sell any kind of intoxicating liquor which had not yet been brought into existence. His whole claim we suppose springs from the rights which his brewery is supposed to have conferred upon him. But these rights we think cannot have such far-reaching conse-

quences as the defendant claims. The beer which the defendant is prosecuted for manufacturing was not in existence at the time when the constitutional amendment was adopted, or at the time when the prohibition act went into operation, but it was manufactured since; and hence, independent of the defendant's interest in his brewery, he could not have had any possible vested right, at the time of the adoption and passage of the present prohibition laws, in the manufacture of such beer. Nearly the same may be said with respect to the beer which the defendant is prosecuted for selling. Presumably it was not in existence at the time when the constitutional amendment was adopted. Besides, the sale of such kinds of liquor, when made as this sale was made, would have been a violation of the laws of Kansas, and a criminal offense, at any time for the last twenty-three years. In this respect the present law is not new. The sale in the present case was made without a permit or a license. It may be that the defendant has suffered great loss on account of the passage of the prohibition act, but such loss is not the direct and immediate result of such act; it is simply the remote and consequential result of the act, and is wholly speculative and problematical. Such indirect and remote losses cannot render acts of the legislature unconstitutional. (*The Beer Co. v. Massachusetts,* 97 U. S. 25; *Bartemeyer v. Iowa,* 85 U. S. [18 Wall.] 129.)

It is frequently the case that the passage of statutes indirectly affects the values of property as this act does, and still we do not think that such statutes are ever declared to be unconstitutional merely for such reasons. We think that the present prohibition act of Kansas is constitutional, so far as it affects the defendant, and so far as it has any application to the two cases now under consideration. We do not think that the court below committed any error in either of these two cases; but even if it did with respect to the motions of the defendant, which it overruled, the errors were wholly immaterial. In the first case, the defendant was tried upon an agreed statement of facts simply for manufacturing

18 — 29 KAS.

intoxicating liquors contrary to law. In the second case, he was tried upon an agreed statement of facts, upon the first count only of the indictment, and merely for selling intoxicating liquor contrary to law, and for one sale only; and in both cases we think the judgment of the court below was correct; and it will therefore be affirmed.

HORTON, C. J., concurring.

BREWER, J.: I concur fully in the foregoing opinion, so far as it relates to the charge of selling beer; and I think the reasoning of my brother VALENTINE thereon is unanswerable. But as to the case in which the charge is of manufacturing beer, and without regard to the purpose for which it was manufactured, while I do not care to formally dissent, I must say that my judgment is not satisfied. The defendant may have manufactured the beer for his own consumption. It certainly is not shown or alleged that he did not, and in a criminal proceeding it is not to be presumed that defendant has done wrong. And I have yet to be convinced that the legislature has the power to prescribe what a citizen shall eat or drink, or what medicines he shall take, or prevent him from growing or manufacturing that which his judgment approves for his own use as food, drink, or medicine.

Further, prior to the constitutional amendment, the manufacture of beer was free and unrestricted. No license, permit or condition was required. Under that state of the law this defendant invested his means in building and machinery suitable for the purpose of manufacturing beer, and unsuitable for any other purpose, worth $10,000 for the former use, and not to exceed $2,500 otherwise. The denial of the use has thus practically deprived him of $7,500. Is not this taking private property for public use, without any compensation? If the public good requires the destruction of the value of this property, is not prior compensation indispensable?