### State v. WALRUFF and others.[1]

*(Circuit Court, D. Kansas.    January 22, 1886.)*

CONSTITUTIONAL LAW—FOURTEENTH AMENDMENT—POWER OF STATE TO PRE-
VENT USE OF PROPERTY IN MANUFACTURE OF LIQUORS WITHOUT COMPEN-
SATION—DUE PROCESS OF LAW.

Between 1870 and 1874 defendants constructed a brewery in Lawrence, Kan-
sas.    The building, machinery, and fixtures were designed and adapted for
the making of beer, and nothing else.    For such purpose they were worth
$50,000; for any other purpose not to exceed $5,000.    At the time of the erec-
tion of the building, and up to 1880, the making of beer was legal, but in that
year a constitutional amendment was adopted, prohibiting the manufacture
of beer except for medicinal, scientific, and mechanical purposes, and in 1881
and 1885 laws were enacted to carry this prohibition into effect.    Under these
laws a permit was essential for the manufacture for the excepted purposes.
To the defendants this permit was refused.    An injunction was thereupon
sued out from the state court, enjoining defendants *absolutely* from the man-
ufacture of beer.    *Held* that, in so far as the constitutional amendment, and
the statutes passed in pursuance thereof, deprived defendants of the use of
their property, acquired previous to the adoption of the amendment, without
compensation, they deprived them of their property without due process of
law, within the meaning of the fourteenth amendment to the constitution of
the United States, and were void.[2]

2. SAME—REMOVAL OF CAUSE—FEDERAL QUESTION.

*Held, further,* that the construction of the constitutional amendment and
the acts of 1881 and 1885, under the circumstances of this case, presented a
federal question, and the defendants had the right to remove the case from
the state court to the United States circuit court for decision.

On Motion by Plaintiff to Remand Case to State Court.    The
opinion states the facts.

*R. A. French, Geo. J. Barker, C. S. Gleed,* and *J. W. Gleed,* for
plaintiff.

This is a civil case commenced in the district court of Douglas
county, state of Kansas, by the county attorney of said county, to
abate an alleged nuisance, to-wit, a place where intoxicating liquors
are manufactured, bartered, sold, and given away, in violation of
the prohibitory liquor law of the state, (chapter 128, Laws 1881, as
amended by chapter 149, Laws 1885.)    The defendants filed with
the clerk of the district court a bond and petition for removal to this
court, and, on the hearing of said petition, the same was overruled
by the judge of said court, and said case held for trial.    The defend-
ants thereupon filed in this court transcripts of the records therein,
and had said action placed upon the docket of this court.    This ac-
tion is removable, if removable at all, under the removal act of 1875,
and under the second paragraph of that act, which is as follows:

"That any suit of a civil nature, at law or in equity, now pending or here-
after brought in any state court, where the matter in dispute exceeds, exclu-
sive of costs, the sum or value of five hundred dollars, and arising under the
constitution and laws of the United States, or treaties made." etc.

[1] Reported by Robertson Howard, Esq., of the St. Paul bar.
[2] See note at end of case.

The questions, then, to be determined by this tribunal at this time are: (1) Whether the matter in dispute in this case exceeds, exclusive of costs, the value of $500; and (2) whether the matter in dispute in this case arises under the constution or laws or treaties of the United States. And from the record the affirmative of these two questions must appear, if the case is to be held removable, and the motion to remand is to be overruled.

Does the matter in dispute in this case arise under the constitution or laws of the United States? It has been repeatedly held "that a case in law or equity may properly be said to arise under the constitution or laws of the United States, whenever its correct decision depends upon the construction of either." *Cohen* v. *Virginia,* 6 Wheat. 379. Also, *Mayor* v. *Cooper,* 6 Wall. 252; *Osborn* v. *Bank of U. S.,* 9 Wheat. 816; *Gold-washing & Water Co.* v. *Keyes,* 96 U. S. 201; *Tennessee* v. *Davis,* 100 U. S. 264; *New Orleans M. & T. R. N.* v. *State,* 102 U. S. 135.

Does a correct decision of this case depend upon the construction of the constitution or laws of the United States? We claim not. We claim that this case can be properly decided without reference to the constitution or laws of the United States. Is not this a proper test as to whether correct decision of this case depends on the construction of the constitution or laws of the United States? Suppose the state court grant the prayer of this petition, or suppose it deny the prayer, merely as the law and constitution of the state of Kansas direct: in either case will violence have been done to the constitution or laws of the United States? Certainly not, if the prayer be denied. The question, then, becomes simply this: Would the granting of this prayer, so far as is lawful under the laws of Kansas, do violence to the constitution or laws of the United States? Is the law of the state of Kansas, as to the case here presented, in conflict with federal law? If the laws and the constitution of the United States have received such construction by the supreme court as would not make the granting of the prayer here prayed unconstitutional, then there can be no construction of such laws or constitution involved in this controversy, and this court has no jurisdiction. A decision of the supreme court of the United States, that the constitution does not apply to cases and questions like those here presented, is as conclusive as if a statute expressly enacted it. It is well settled that, in the courts of the United States, the special facts necessary for jurisdiction must appear in the record of every suit, and that the right of removal from the state courts to the United States courts is statutory. *Gold-washing & Water Co.* v. *Keyes,* 96 U. S. 199. For the purpose of the transfer of a cause, the petition for removal which the statute requires performed the office of pleading. The office of pleading is to state facts, not the conclusions of law. Assuming, then, that the facts stated in the petition for removal are true, so far as they are consistent with each other, and leaving out of consideration the con-

clusions of law improperly inserted in that petition, and further assuming that the facts set forth in the plaintiff's petition are true, then would the application of the laws of this state to these facts do violence to those clauses of the constitution upon which defendants rely, namely, the fourth, fifth, and fourteenth amendments? If not, this case should be remanded.

The attention of the court is first called to the facts set forth in the original petition and the petition for removal. Plaintiff's bill or petition in this case alleges, in substance, that certain premises, (describing them,) commonly known as "Walruff's Brewery," is a place where spirituous, vinous, fermented, malt, and other intoxicating liquors are manufactured and kept for barter, sale, and gift, and are sold, bartered, and given away in violation of the law; that said place, in consequence thereof, is a common nuisance, etc.; that said defendants (naming them) are the keepers of and maintain and operate said place, etc.; that said defendants, or either of them, have no permit issued or granted by the probate judge of Douglas county, Kansas, authorizing defendants, nor any or either of them, to manufacture, sell, barter, or give away, or manufacture, or keep for sale, barter, or gift, any intoxicating liquors; that the defendant E. Walruff is the owner of the premises above described, and has full knowledge of the unlawful purposes for which said place is being used, and knows that said premises are being used as a place where intoxicating liquors are *manufactured and kept* for barter, sale, and gift, in violation of the law, and that said E. Walruff has no permit, etc., and that said E. Walruff permits her co-defendants to maintain the said common nuisance; that the said place is a common nuisance of great injury to the public, which injury is irreparable, and cannot be compensated in damages. Such is the gist of plaintiff's cause of action. And the prayer, based on this statement of facts, is as follows:

"*First.* That the said premises, to-wit, a certain brick building situated on numbers thirty-seven, (37,) thirty-nine, (39,) and forty-one, (41,) in block six, (6,) on the west side of Maine street, in the city of Lawrence, county of Douglas, state of Kansas, and also being commonly known as 'Walruff's Brewery,' may be adjudged by the court to be a common nuisance; and that an order may issue directing the sheriff, or other proper officer, to shut up and abate said place. *Second.* That the defendants, and each of them, their agents, servants, and employes, may be perpetually enjoined from using, or permitting to be used, the said premises as a place where intoxicating liquors are manufactured, sold, bartered, or given away, or are manufactured or kept for barter, sale, or gift, otherwise than by authority of law. *Third.* That in the mean time the said defendants, and each of them, their agents, servants, and employes, may be enjoined, until the further order of the court, from keeping open, or permitting to be kept open, the premises above described, and from manufacturing, selling, bartering, or giving away, and from manufacturing, and from keeping for barter, sale, or gift, or use, in or about said premises, any of the intoxicating liquors above described, or permitting such liquors to be manufactured, sold, bartered, or given away, or kept or manufactured," etc.

The further facts proper for this court to consider at this time are such as are properly pleaded in defendants' petition for removal. The conclusions of law in that petition must of course be distinguished from the facts set up therein. The allegations of defendants' petition for removal are as follows:

"That the matter in dispute exceeds, exclusive of costs, the sum of five hundred dollars; that defendant E. Walruff is now, and was at the time of the commencement of this action, the owner of the premises in question; that said premises are, for the purposes for which they were designed, worth the sum of $50,000; that said buildings were erected, between the years 1870 and 1874, for the purpose of *manufacturing* malt liquors, and that at the time of such erection such purpose was legal, and fully authorized by the laws of the state of Kansas; that said buildings, for any other purpose than the manufacture of malt liquors, are not worth to exceed $5,000; that said buildings and improvements were owned and used by defendants E. Walruff and John Walruff, for the purposes aforesaid, from the time of their erection up to and until the year 1881, without limitation or legal restriction; that by an amendment to the constitution of the state of Kansas, adopted in the year 1880, the manufacture of intoxicating liquors was forever prohibited in said state, except for medicinal, scientific, and mechanical purposes; that on May 1, 1881, a law enacted in pursuance of said amendment went into force; that afterwards, on the seventh day of March, 1885, the legislature enacted an amendment to the law of 1881; that under said constitutional amendment it was lawful to manufacture and sell malt and fermented liquors for medicinal, scientific, and mechanical purposes, without restriction or limitation. [The petition thereafter quotes a portion of the law of the state restricting and regulating the manufacture and sale of intoxicating liquors for medicinal, scientific, and mechanical purposes.] That on the seventh of August, 1883, E. Walruff and John Walruff conveyed to Fritz Iseman and August F. Walruff, by a contract of sale, the premises in question; that afterwards all the parties defendant duly petitioned the probate judge of Douglas county for a permit to manufacture and sell at said brewery malt and fermented liquors for medicinal, mechanical, and scientific purposes, which petitions were refused; that by reason of said action of said probate judge, and of his refusal to grant a permit to manufacture at said brewery and sell malt and fermented liquors for medicinal, scientific, and mechanical purposes, defendants, E. Walruff and John Walruff, Fritz Iseman, and August F. Walruff, have been and are deprived of the use of the brewery property aforesaid, and the value thereof has been greatly impaired, to the amount of forty-five thousand dollars; that John Walruff and E. Walruff have used the said property for the purpose of manufacturing and selling malt and fermented liquors for medicinal, scientific, and mechanical purposes, and desire to continue to so use it; that the defendants are citizens of the United States and of the state of Kansas, and that they have a defense arising under articles 4, 5, and 14 of the amendments to the constitution of the United States; that the effect of this action, if prayer of the petition be granted, will be to deprive defendants of property without due process of law, and subject them to unreasonable seizure of property; that the law of the state of Kansas under which this action was brought is in conflict with the constitution of the United States."

This petition is verified upon belief merely.

Briefly, what are the facts giving rise to this controversy as gathered from the records filed in this case, and what is the law applicable to them as gathered from the decisions and statutes of the state of Kansas? Between the years 1870 and 1874 defendant E. Walruff

invested, as she claims, $50,000 in a certain property consisting of land, buildings, and fixtures adapted to the manufacture of intoxicating liquors. This court may take notice of the fact, though it is not specially stated in the record, that *sale* of such liquors was the real aim of this investment, and that the premises were adapted to the manufacture of liquors for sale; that, substantially, the privilege to sell what was manufactured was what induced and what made valuable this investment. At the time this investment was made the privilege to sell or give away intoxicating liquors was a wholly conditional, contingent, and defeasible one. The substantial value of this investment lay in the privilege to sell; and this privilege the law distinctly pronounced to be a privilege, and in no sense a right,—a privilege wholly subject to the police power of the state. The privilege to *manufacture* was not, it is true, in terms, restricted; but by a clear and indubitable inference it was. There was a *de facto* commercial limitation. *State* v. *Mugler*, 29 Kan. 252. The case of *Beer Co.* v. *Massachusetts*, 97 U. S. 25, holds that the grant of right to manufacture carried with it right to sell. We apprehend, then, that a restriction on the right to sell is *pro tanto* a restriction on the manufacture. The law made this limitation by fair inference. Though it may be said that defendant might have manufactured in this state and sold in another, it is answered that a state, in the enactment of law, generally contemplates the existence of no other sovereignty but itself. In 1880 an amendment to the constitution of the state was enacted, providing that the *sale* of intoxicating liquors shall be forever prohibited in this state, except for medicinal, scientific, and mechanical purposes. That amendment was, by the supreme court of the state of Kansas, declared not to be in conflict with the constitution of the United States. *Prohibitory Amendment Cases*, 24 Kan. 100. This decision is too abundantly sustained to need argument. *Bartemeyer* v. *Iowa*, 18 Wall. 129; *Beer Co.* v. *Massachusetts*, 97 U. S. 25; *State* v. *Tucker*, 38 Iowa, 496. Nor can I find in defendants' petition for removal that this is denied. On the contrary, they seem to confine themselves to laws subsequently passed. This amendment withdrew from defendant E. Walruff, and from all persons soever, the substantial portion of any privilege they may previously have possessed, not only as to sale, but as to manufacture. I say a substantial portion, and I think it proper for this court to take cognizance of this fact: that the amendment withdrew by far the most valuable part of the privilege previously extended defendants. This is a matter of common knowledge, easily susceptible of proof. At any rate, this court must recognize the fact that it withdrew some portion of the privilege. Here, then, E. Walruff must have sustained the greater part of the pecuniary loss, if any, of which she complains; certainly some portion of that loss. Defendants will urge that this law prohibiting the sale of liquors depreciated the value of their brewery; that to depreciate the value of property is to "deprive" de-

fendants of it within the meaning of the fourteenth amendment. Undoubtedly, diminution of the value of this brewery proceeds *pari passu* with restriction upon the privilege to sell liquors brewed. But the right to prohibit sales of liquors is established beyond question. The same state decision which declared the amendment constitutional, declared that the manufacture and sale for the excepted purposes were still subject to the limitations and conditions previously thrown around them. The court say:

"Before the amendment, and under the dram-shop act, the licensed dealer might sell to adults not habitual drunkards, upon secular days not devoted to special purposes. Under the amendment such licensed dealer may still sell, but only for certain purposes. The right to sell remains. The conditions of license continue." *Prohibitory Amendment Cases*, 24 Kan. 723.

So that, at this time, the state of the law was such that this defendant could neither manufacture nor sell intoxicating liquors except for certain purposes; and, to *sell* for these purposes, he must have a license, and the obtaining of this license was still as uncertain and contingent as at the time defendant made her investment. This state of the law was constitutional, both upon authority and the admission of this petition. The law had very much restricted the sale, and, both by express enactment and inevitable natural consequence, the manufacture, of intoxicating liquors; and still no constitutional right of defendant had been violated. The inevitable conclusion, then, must be that defendant E. Walruff had acquired (1) no vested right to sell intoxicating liquors; (2) no vested right to manufacture intoxicating liquors for sale.

The withdrawal of the right to sell withdraws necessarily all there is of value in the privilege to manufacture for sale. The privilege to manufacture and sell for the excepted purposes still remained, but conditional and defeasible, as before.

In 1881 the legislature enacted a law, in pursuance of the amendment, altering the restrictions already existing as to sale for the excepted purposes. The privilege before had depended upon the arbitrary decision of the residents of the community. It was now made a subject of *quasi* judicial inquiry. The effect of this law is set forth in *State* v. *Mugler*, 29 Kan. 252, the facts in which I need not recite. The effect of that law is settled by the construction there laid down. This court is bound by the construction put upon that law by that court. If, with that construction, the law does not conflict with the laws or constitution of the United States, that law must be held constitutional by this court. This court cannot say: "That state law, as construed by the state court, was constitutional; but we prefer to put a different construction upon it, which will make it unconstitutional." The opinion in that case contains the following words:

"In 1877, when the defendant erected his brewery, he had a right to manufacture all the beer or other intoxicating liquor which he chose; and he can do so still, provided he first obtains a permit therefor from the probate judge; and he can easily obtain the permit by complying with the terms and condi-

tions upon which permits are issued. At that time he could manufacture intoxicating liquors for any purpose which he chose; but since the adoption of the constitutional amendment, in November, 1880, he can manufacture such liquors only for medicinal, scientific, and mechanical purposes. His right to sell intoxicating liquors, however, has always been restricted."

It certainly seems clear that the right to manufacture for sale, without the right to sell, is a barren, useless right, the withdrawal of which cannot be considered a pecuniary loss. Does this law do violence to the constitutional right of the defendant? Under the law as it stood prior to this act, defendant could *manufacture* intoxicating liquors for medicinal, scientific, and mechanical purposes, perhaps without a license, so far as the letter of the law went, but he could not *sell* without a license; so that the inevitable result was that he could not manufacture without a license. This law of 1881 simply changed the method of obtaining a permit to sell, and provided *expressly* that the privilege to manufacture was conditional. Such is the construction put upon a state law by the supreme court of this state. Is it, thus construed, hostile to any constitutional rights of these defendants? All that this law of 1881 has done is to provide expressly that the defendant, in order to manufacture for medicinal, scientific, and mechanical purposes, must have a permit. This restriction existed *de facto* before the law of 1881 was passed. The law of 1885 does not affect the primary rights or privileges of defendants under the law of 1881. It simply supplied additional remedies for the enforcement of the law. These remedies are not new to the law, though the application of them to this particular class of cases may be new.

. On the twenty-seventh day of August, 1883, as appears from the petition of removal, E. Walruff, her husband joining her, sold the premises on which the brewery in question stands, together with other property, to August F. Walruff and Fritz Iseman, for the sum of $80,000, $24,000 of which appears to have been paid in cash. The sale was by a bond for a deed. We conceive, therefore, that the title to this property is no longer in E. Walruff, but in defendants August F. Walruff and Fritz Iseman. E. Walruff has her right of action against these defendants, and the debt due her is secured by a lien on this and other property.

Such is a chronological statement of the facts set forth in the record, and of the laws enacted from time to time applicable to those facts. It is not perfectly clear what particular law or portion of a law defendants challenge. We shall therefore argue the whole series of laws, at the same time urging upon the court that the petition for removal raises a question only as to the amendments of 1885.

Now, in what way do any of these enactments of the state of Kansas, as applied to these facts, conflict with the federal constitution? The fourth and fifth amendments are exclusively restrictions on the powers of the federal government, its legislature and processes. *Luther* v. *Borden,* 7 How. 66; *Smith* v. *Maryland,* 1 How. 77; *Green*

v. *Biddle,* 3 Wheat. 88; *Payne* v. *Baldwin,* 3 Smedes & M. 673; *Moore* v. *Coxe,* 10 Wkly. Notes Cas. 135; Desty, Fed. Const. 258, with cases there cited; also page 320 same work; *King* v. *Wilson,* 1 Dill. 555. We do not deem it necessary to argue this point. It is too well settled.

The provisions of the fourteenth amendment upon which defendants rely are these:

"(1) No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; (2) nor deprive any person of life, liberty, or property without due process of law; (3) nor deny any person within its jurisdiction the equal protection of the laws."

This amendment was fully construed in the *Slaughter-House Cases,* 16 Wall. 36. The legislative act which gave rise to these well-known cases contained the following among other provisions: After granting to a certain corporation the sole and exclusive privilege of conducting and carrying on the live-stock landing and slaughter-house business within the limits and privileges granted by the provisions of the act, it says:

"All other stock-landings and slaughter-houses within the parishes of Orleans, Jefferson, and St. Bernard shall be closed, and it will no longer be lawful to slaughter cattle, hogs, calves, sheep, and goats, the meat of which is determined for sale, within the parishes aforesaid, under a penalty of $100 for each and every offense, recoverable, with costs of suit, before any court of competent jurisdiction; that all animals to be slaughtered, the meat whereof is determined for sale in the parishes of Orleans and Jefferson, must be slaughtered in the slaughter-houses erected by the said company or corporation."

The three parishes affected by this act contained 1,154 square miles, and before the passage of the act referred to about 1,000 persons were employed in the business of procuring, preparing, and selling animal food, and had capital invested in buildings, fixtures, and machinery adapted to the slaughtering business, and of small value for any other purposes. In the opinion of the court, delivered by Mr. Justice MILLER, there are laid down the grounds upon which it was urged that this law was in conflict with the constitution of the United States:

"The plaintiffs in error allege that the statute is a violation of the constitution of the United States, in these several particulars: that it creates an involuntary servitude forbidden by the thirteenth amendment; that it abridges the privileges and immunities of the citizens of the United States; that it denies to the plaintiffs the equal protection of the law; and that it deprives them of their property without due process of law,—contrary to the first section of the fourteenth article of amendment."

"Privileges and immunities." What privileges and immunities were intended to be protected by the second clause of the fourteenth amendment are thus defined, and for the purpose of this argument settled, in the *Slaughter-House Cases.* It is expressly held that "the second clause protects, from the hostile legislation of the states, the privileges and immunities of citizens of the United States, as dis-

tinguished from the privileges and immunities of citizens of the states. These latter, as defined by Justice WASHINGTON, in *Corfield* v. *Coryell*, 4 Wash. 371, and by this court in *Ward* v. *Maryland*, 12 Wall. 419, embrace generally those fundamental rights for the security and establishment of which organized society is instituted, and they remain, with certain exceptions mentioned in the federal constitution, under the care of the state governments, and of this class are those set up by plaintiffs.

In *Bartemeyer* v. *State*, 18 Wall. 129, the court say:

"The most liberal advocates of the rights conferred by that amendment have contended for nothing more than that the rights of the citizen previously existing, and dependent wholly on state laws for their recognition, are now placed under the protection of the federal government, and are secured by the federal constitution. The weight of authority is overwhelming that no such immunity has heretofore existed as would prevent state legislatures from regulating and even prohibiting the traffic in intoxicating drinks, *with a solitary exception*. That exception is the case of a law operating so rigidly on property in existence at the time of its passage, *absolutely prohibiting its sale*, as to amount to depriving the owner of his property. A single case, that of *Wynehamer* v. *People*, 13 N. Y. 486, has held that as to such property the statute would be void for that reason. But no case has held that such a law was void as violating the privileges or immunities of citizens of a state, or of the United States. If, however, such a proposition is seriously urged, we think that the right to sell intoxicating liquors, so far as such right exists, is not one of the rights growing out of citizenship of the United States, and in this regard the case falls within the principles laid down by this court in the *Slaughter-House Cases*."

This opinion was delivered by Judge MILLER. It is to be noticed that the court goes out of its way to note the "solitary exception." In one solitary case may the constitutionality of prohibitory laws be questioned. That exception is quite fully discussed. Justice FIELD, in a concurring opinion, says:

"I have no doubt of the power of the state to regulate the sale of intoxicating liquors when such regulation does not amount to the destruction of the right of property in them. The right of property in an article involves the power to sell and dispose of such article, as well as to use and enjoy it. An act which declares that the owner shall neither sell nor dispose of it, nor use and enjoy it, confiscates it, depriving him of his property without due process of law."

"Nor shall any state deny to any person within its jurisdiction the equal protection of the laws." The opinion in the *Slaughter-House Cases* thus construes this provision:

"In the light of the history of these amendments, and the pervading purpose of them, which we have already discussed, it is not difficult to give a meaning to this clause. The existence of laws in the states where the newly-emancipated negroes resided, which discriminated with gross injustice and hardship against them as a class, was the evil to be remedied by this clause, and by it such laws are forbidden. If, however, the states did not conform their laws to its requirements, then, by the fifth section of the article of the amendment, congress was authorized to enforce it by suitable legislation. We doubt very much whether any action of a state, not directed by way of discrimination against the negroes as a class, or on account of their race,

will ever be held to come within the purview of this provision. It is so clearly a provision for that race and that emergency that a strong case would be necessary for its application to any other."

It does not appear from the petition, but we presume the argument will develop the fact, that defendants really rely on this section of that amendment: "Nor shall any state deprive any person of life, liberty, or property without due process of law." (1) Are defendants deprived of property? (2) If so, is it without due process of law? The idea of property has two aspects: Objectively considered, it is the tangible, physical thing; subjectively considered, it is the right of the individual in regard to that thing. Generally speaking, this right combines two elements: (1) The right to sell; (2) the right to use. The property right may be (1) defeasible; (2) indefeasible. And this may be so, either by act of law, or by act of the parties.

This section can, of course, only be raised in behalf of defendant E. Walruff. John Walruff never owned the property in question, and Fritz Iseman and August Walruff bought it after its use as a brewery had become illegal. Neither do we think that E. Walruff can claim that she is being deprived of her property by the prohibition laws, except as they may be said to reduce the value of the security upon which she may rely for the payment of the debt due her from Iseman and August Walruff. It is not claimed that defendant is deprived of her property in the objective sense. She is not deprived of the tangible, physical thing. It is not claimed that defendant is deprived of her property, subjectively considered, so far as the right to sell it is concerned. It is not claimed that defendant is deprived of her property by being deprived of its use generally. The only claim is that defendant has been deprived of one particular use.

(1) Has defendant been deprived of a particular use which was ever indefeasibly hers? (2) If so, does such restriction upon the use amount to a deprivation of property within the meaning of the constitution? At the time this brewery was erected, the right to sell was a defeasible right; or, rather, defendant had a mere privilege to sell. The state had reserved the right to withdraw this privilege at any time. 29 Kan. 252. The right to manufacture for sale was therefore defeasible, because (1) a state, in the enactment of law, generally contemplates the existence of no other sovereignty than itself. Thus, the supreme court, in *Bartemeyer* v. *Iowa*, 18 Wall. 129, intimates that an enactment in that state prohibiting sale takes away *all* right to sell, notwithstanding there are many other markets for liquor outside that state. (2) The supreme court, in *Beer Co.* v. *Massachusetts*, 97 U. S. 32, says: "The right to manufacture includes the incidental right to dispose of the liquors manufactured." To take away the right to sell is to take away, *de facto*, the right to manufacture for sale. We conclude, therefore, that the right of defendants to manufacture for sale was a defeasible, conditional right, as was the right to sell, subject at all times to be withdrawn. Accordingly,

defendant has not been deprived in that respect of any use ever inde-feasibly hers. Before the enactment of the amendment, defendant had the privilege to use her property (1) in the manufacture of liq-uors for sale as a beverage; (2) in the manufacture of liquors for sale for medicinal, mechanical, and scientific purposes; (3) in the manufacture of liquors for her own use. After the enactment of the amendment, she had the privilege to use her property only (1) in the manufacture of liquors for sale for medicinal, mechanical, and scientific purposes; (2) in the manufacture of liquors for her own use. And the first of these privileges was still defeasible. She had lost the use of her property for the manufacture of liquors for sale as a beverage; and this would have been so had the *express* prohibition been merely on the *sale*. Can the court say that the privilege to sell had been taken away constitutionally, but that the privilege to man-ufacture remained,—the *express* prohibition of the manufacture be-ing unconstitutional,—when the supreme court says that the right to manufacture includes the right to sell? But if the court shall hold that defendant has been deprived of a particular use of her property which was once indefeasibly hers, does such restriction upon the use amount to a deprivation of property, within the meaning of the con-stitution? The legislative act complained of in the *Slaughter-House Cases* contained the following provision:

"All other stock-landings and slaughter-houses within the parishes of Or-leans, Jefferson, and St. Bernard shall be closed, and it will no longer be law-ful to slaughter cattle, hogs, calves, sheep, and goats therein, under a penalty of one hundred dollars for each and every offense."

In delivering the opinion of the court, Justice MILLER said:

"The plaintiffs in error allege that the statute is a violation of the consti-tution of the United States in these several particulars: ' * * * That it deprives them of their property without due process of law.' "

And further on he says:

"We are not without judicial determination, both state and national, of the meaning of this clause, and it is sufficient to say that, under no construction of that provision that we have ever seen, or in any that we deem admissible, can the restraint imposed by the state of Louisiana upon the exercise of their trade by the butchers of New Orleans be held to be a deprivation of property within the meaning of that provision."

We submit that, to prohibit a man from using his stock-landing and his slaughter-house or packing-house for the purposes for which they were specially designed, deprives him of that property to just as great a degree as to prohibit a man from using his brewery for the manufacture of liquors for sale. In *Boston Beer Co.* v. *State*, 97 U. S. 25, it was decided in 1877 that all rights are held subject to the police power of a state; that if the public safety or the public morals require the discontinuance of any manufacture or traffic, the legisla-ture may provide for its discontinuance, notwithstanding individuals or corporations may suffer inconvenience; that, as the police power of a state extends to the protection of the lives, health, and property

of her citizens, the maintenance of good order, and the preservation of public morals, the legislature cannot by any contract divest itself of the power to provide for these objects. And the court, reaffirming its decision in the Iowa case, held that, as a measure of police regulation, a state law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the constitution of the United States. All the justices concurred in this decision. This case was a proceeding for the forfeiture of certain malt liquors belonging to the Boston Beer Company, which had been seized while being transported to the place of business of the company for purposes of sale, in violation of an act of the legislature commonly known as the "Prohibitory Liquor Law." This company had been engaged in the manufacture of malt liquors for 60 years at the time the prohibitory liquor law was passed, and had been specially chartered for that purpose by the state. It must be presumed to have made large investments in buildings and machinery adapted to the purposes for which the company was incorporated. Yet Mr. Justice BRADLEY, in delivering the opinion of the court in that case, says:

"The plaintiff in error was incorporated for the purpose of manufacturing malt liquors in their varieties, it is true; and the right to manufacture undoubtedly, as the plaintiff's counsel contends, included the incidental right to dispose of the liquors manufactured. But, although this right or capacity was thus granted in the most unqualified form, it cannot be construed as conferring any greater or more sacred right than any citizen had to manufacture malt liquor; nor as exempting the corporation from any control therein to which a citizen would be subject, if the interests of the community should require it. If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer."

It is to be particularly noticed, in regard to this case, that the beer company had acquired, not only all rights which the citizen ordinarily acquires by investments in a business legitimate at the time of the investment, but these rights had apparently been added to by express grant.

Now, suppose we compare the *Slaughter-House Cases* with this case. In the *Slaughter-House Cases* the record showed that, prior to the legislative act complained of, a thousand men were engaged in slaughtering and preparing animals for food, and had money invested in buildings and fixtures adapted to those purposes. Upon the business in which they were engaged, and in which their money was invested, there were no legal limitations or restrictions soever, and no intimation of any. In this case the defendant was engaged in a business and had her money invested in a business which was, at the time of her investment, barely tolerated by the law. She knew at the time she made her investment that the laws of this state were such that the right to sell might be withdrawn at any time, and she be rendered powerless to proceed with the manufacture. She had every reason

to believe that she had only a contingent, temporary, defeasible privilege to conduct her business, and make use of her property therein. They certainly had some reason to believe that they had an absolute, perpetual, and unconditional right to engage in and continue in their business, and make use of their property therein. In those cases the act of the legislature took away all right to use buildings and fixtures for the purposes for which they were intended. In this case the act of the legislature still allowed defendant to use her property for the manufacture of liquors for medical, mechanical, and scientific purposes, provided she could satisfy the probate judge that she was a proper party to receive a permit. In those cases the privileges taken away were conferred upon a monopoly, according to the opinion of a minority of the court. In this case there is no claim that a monopoly has been created. In those cases the legislative enactment provided *expressly* that certain buildings and fixtures should not be longer used for the purposes for which they were designed. The enactment in this case falls far short of that. Can this law be held to deprive defendant of property without due process of law, when that did not? We maintain that the laws complained of here are wholly within the police power of the state.

Judge DILLON, in his work on Municipal Corporations, (page 136,) says:

"But it may here be observed that every citizen holds his property subject to the proper exercise of this power; * * * and it is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors or the citizens generally. * * * It is not a taking of private property for public use, but a salutary restraint on a noxious use by the owner. * * * That, among these police powers, is the right of the state to regulate, prohibit, and suppress the liquor traffic, has not been doubted in this country since the *License Cases* of 5 How. 504."

"If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the state." *Beer Co.* v. *Massachusetts*, 97 U. S. 25.

The whole question in this case is as to the boundaries of the police power of a state. It has never been intimated that the state cannot prohibit the sale of intoxicating liquors. The supreme court has indicated the sole instance where such prohibition might raise a constitutional question. It is clear that such a law is constitutional as to sellers who have property invested in fixtures adapted to such selling; and, if so, is it not constitutional as to those who have property invested in fixtures for the manufacture? If defendant in this case was deprived of her property without due process of law, then every

person who has engaged in the selling of liquors at the time of the passage of the amendment, and who had money invested in fixtures adapted to that purpose, has been deprived of property without due process of law. But defendants seek to draw this distinction between the prohibition of the sale and the prohibition of the manufacture in this state. They allege that, before the enactment of the amendment, though the right to sell was limited and restricted, the right to manufacture was not. We maintain that, so far as the vesting of any right to sell or to manufacture, the two are on the same footing; that, so far as *vested rights* are concerned, any restriction upon sale was a restriction upon manufacture, by inference and construction. Defendants will deny this. Defendants come here, and claim that because a law restrains defendant in one particular in the use of her property, that by construction or inference that law deprives her of that property; but at the same time they deny that the prohibition of the sale of an article, or the restriction of such sale, can, by any construction or inference, be deemed a prohibition or restriction of the manufacture for sale. The whole of defendant's loss here alleged lies in the loss of the privilege to manufacture for sale, and her privilege to sell was always uncertain and defeasible.

But let us go further, and admit, for the sake of argument, that, before the amendment, defendant's right to manufacture was not restricted, either expressly or inferentially. What then? The privilege of plaintiffs in the *Slaughter-House Cases* was not restricted either expressly or inferentially. The record in the *Bartemeyer Case* does not show that the right to sell was restricted at the time Bartemeyer first invested in the fixtures of the business and embarked in the trade. And it is to be observed that in the opinion in this case the constitutionality of the prohibitory laws is not *denied* under any circumstances, and it is doubted only as to *one* extreme case, namely, where the law actually prohibits the sale of an article which it was proper to sell (and which was owned) before the law was passed. That case is expressly denominated the sole case where a doubt would arise. We say, therefore, that the questions attempted to be raised here are no longer questions. The controversy, and the only controversy, here is as to the extent of the police power to restrict the use of property; and that identical question, as it arises here, was settled in the *Slaughter-House Cases*. Accordingly, it seems clear in this case that the state has not deprived defendant of her property, but has merely restricted one of the two rights which together constitute the right of property, and that the state in the beginning reserved the power to make that restriction. But supposing defendant to be deprived of her property within the meaning of the constitution, is it without due process of law? The phrase "due process of law" is probably identical, or nearly identical, with the phrase "law of the land." In the *Dartmouth College Case*, 4 Wheat. 518, Webster defines the latter phrase thus: "By the law of the land is meant the general law,

which hears before it condemns, which proceeds upon inquiry, and renders judgment only upon trial." The meaning is that every citizen holds his life, liberty, and property and immunities under the protection of the general laws which govern society. Can the law complained of by defendants be said to condemn without hearing, to proceed without an inquiry, and to render judgment without trial? It seems to us not.

It is urged that the act of 1885 is in contravention of section 1 of article 14 of the constitution of the United States; that the enforcement of said act in the proceedings instituted by plaintiff herein will deprive defendants of their property without due process of law, and abridge their privileges and immunities by not granting them a trial by jury. If the prayer of plaintiff's petition herein should be granted, would it be a taking of property within the meaning of the fourteenth amendment? and, if so, would it be a taking without "due process of law," in violation of said amendment, or abridge the privileges or immunities of defendants by not giving them a jury trial? We claim not. It must be conceded that if this is an action commenced or continued according to the due course of legal proceedings, and according to those rules and forms which have been established for the protection of private rights, it is "due process of law," and is not in violation of any part of the fourteenth amendment. *Kennard* v. *Louisiana*, 92 U. S. 481. When the statute makes ample provision for judicial inquiry, it is "due process of law." *Pearson* v. *Yewdall*, 95 U. S. 294.

In the case of *Murry* v. *Hoboken Land & Imp. Co.*, 18 How. 276, the court thus defines "due process of law:"

"For though 'due process of law' generally includes *actor, reus, judex,* regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, * * * yet this is not universally true."

"Due process of law" does not mean judicial process. *McMillin* v. *Anderson*, 95 U. S. 37, 42. "Due process of law" includes summary process. 18 How. 276.

In the case of *Walker* v. *Sauvinet*, 92 U. S. 92, 93, the court say:

"So far as we can discern from the record, the only federal question decided by either one of the courts below was that with relation to the right of Walker to demand a trial by jury, notwithstanding the provisions of the act of 1871 to the contrary. He insists that he had a constitutional right to such a trial, and that the statute was void to the extent that it deprived him of this right. * * * The states, so far as this amendment is concerned, are left to regulate trials in their own courts in their own way. A trial by jury in suits at common law pending in the state courts is not, therefore, a privilege or immunity of natural citizenship which the states are forbidden by the fourteenth amendment to abridge. A state cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the state courts affecting the property of persons must be by jury. This requirement of the constitution is met if the trial is had according to the settled course of judicial proceedings."

The case of *Kennard* v. *Louisiana*, 92 U. S. 480, was a proceeding to remove Kennard from office. This was commenced by rule to show cause why he would not surrender his office. Service was had, time given to answer, an opportunity to be heard, and this was held to be due process of law. On page 483, the court say:

"Upon this, [the return of the rule,] he asked a trial by jury. This the court refused, and properly, because the law under which the proceedings were had provided in terms that there should be no such trial. He then went to trial. * * * From this it appears that ample provision had been made for the trial of the contestation before a court of competent jurisdiction, for bringing the party against whom the proceeding is had before the court, and notifying him of the case he is required to meet, for giving him an opportunity to be heard in his defense, for the deliberation and judgment of the court, for an appeal from this judgment to the highest court of the state, and for hearing and judgment there. A mere statement of the facts carries with it a complete answer to all the constitutional objections urged against the validity of the act. The remedy provided was certainly speedy; but it could only be enforced by means of orderly proceedings in a court of competent jurisdiction, in accordance with the rules and forms established for the protection of the rights of the parties. In this particular case, the party complaining not only had the right to be heard, but he was in fact heard, both in the court in which proceedings were originally instituted, and upon his appeal in the highest court of the state."

After a careful consideration of the authorities above cited, and the case of *Littleton* v. *Fritz*, 22 N. W. Rep. 641, we are satisfied that they answer all the constitutional objections urged by defendants against this proceeding.

This is a suit commenced as all other civil suits are commenced in the courts of this state,—the same service of process, time for answer, appearance, defense, trial, deliberation, and judgment as allowed in all civil cases,—nothing peculiar about it. Neither does it differ in any particular whatever from other cases of like character. By this action the state does not seek to take the property of the defendants. It is simply a proceeding to restrain or stay the defendants from using their property for illegal purposes,—to prevent them from violating the laws of the state. We fail to discover anything in this case which gives this court jurisdiction. It seems quite clear to us that jurisdiction of this case would not have been entertained by this court if it had been originally commenced here.

Judge McCRARY of this circuit, in the case of *Long* v. *Laclede Bank*, 18 Fed. Rep. 193, held "that these two sections [act 1875] are to be regarded as *in pari materia*, and that the second section could not be construed to confer upon the circuit court jurisdiction in a case in which it would not have jurisdiction under the first section; that if a party could not originally sue in that court, he could not come into it through the state court."

In the case of *Virginia* v. *Rives*, 100 U. S. 337, Judge FIELD says:

"If it [the federal court] could not have jurisdiction at the first, it cannot upon a removal of the prosecution to it. * * * The removal is only an indirect mode by which the federal court acquires original jurisdiction.

If the effect of this proceeding was to take property without due process of law, it would yet be a matter within the control of the state courts, and not such a violation of the fourteenth amendment as to call for judicial action of the federal courts."

We have only one further question to present, and this we shall not argue, but are content merely to raise it and submit authorities upon it. Does the matter in dispute exceed, exclusive of costs, the sum or value of five hundred dollars? *Barry* v. *Mercein*, 5 How. 103, 119, 120; *Pratt* v. *Fitzhugh*, 1 Black, 271, 273; *De Krafft* v. *Barney*, 2 Black, 704; *Lownsdale* v. *Parrish*, 21 How. 290; *Sparrow* v. *Strong*, 3 Wall. 97, 103, 104; *Potts* v. *Chumasero*, 92 U. S. 358, 361; *Youngstown Bank* v. *Hughes*, 106 U. S. 523; S. C. 1 Sup. Ct. Rep. 489.

We ask that the motion be sustained, and the case remanded.

*Samuel A. Riggs* and *W. W. Nevison*, for defendants.

BREWER, J. The facts upon which the foundation question in this case rests are few and simple. Between 1870 and 1874 the defendants constructed a brewery in Lawrence, Kansas. The building, machinery, and fixtures were designed and adapted for the making of beer and for nothing else. For such purpose they are worth $50,000; for any other use not to exceed $5,000. At the time of the erection of the building, and up to 1880, the making of beer was as legal, as free from tax, license, or other restriction, as the milling of flour. In that year a constitutional amendment was adopted, prohibiting the manufacture of beer except for medicinal, scientific, and mechanical purposes. In 1881 and 1885 laws were enacted to carry this prohibition into effect. Under these laws a permit was essential for the manufacture for the excepted purposes. To the defendants this permit was refused. An injunction was thereupon sued out from the district court enjoining defendants absolutely from the manufacture of beer. Thus, in strict conformity to the laws of the state, the defendants are prohibited from using their property for the purposes for which alone it is designed, adapted, and valuable, and are required, without compensation, to surrender $45,000 of value which they had acquired under every solemn unlimited guaranty of protection to property which constitutional declaration and the underlying thought of just and stable government could give. The action in which this injunction was granted they now seek to remove to this court, and insist that, no matter what the state may think or do, the fourteenth amendment to the federal constitution does give protection, or, at least, that they are entitled to the opinion and judgment of the federal courts upon the question whether that portion of the fourteenth amendment which forbids a state to "deprive any person of life, liberty, or property, without due process of law," and "to deny to any person within its jurisdiction the equal protection of the laws," is not violated by this action of the state as respects them.

It is idle to deny that the question here presented is one of diffi-

culty and grave importance. On the one hand, it is insisted that both the amendment and the laws were duly, and in compliance with established forms of procedure, adopted and enacted; that the withholding of the permit was the act of a judicial officer in the exercise of a proper and granted discretion; that the injunction was issued out of the regular court of general original jurisdiction, and in an ordinary and familiar form of action; that thus there has been "due process of law;" and that the amendment does not prohibit a state from depriving a person of his property, but only prohibits such deprivation "without due process of law." While, on the other hand, it is apparent that the defendants, having invested large properties in a perfectly legal business, are stripped of the value of such properties; and that, not as the indirect and consequential result of legislative changes in the law, but by a direct prohibition upon the only use for which such properties are designed, adapted, and valuable. Is a state potent, through the forms of law, to take from a citizen by direct action the value of his property without compensation?

As the judge of an inferior federal court, I turn naturally to the opinions of my superior, the supreme court of the United States, for information and guidance. In the case of *Bartemeyer* v. *Iowa,* 18 Wall. 129, the opinion of the court was delivered by Justice MILLER, and in it the court uses this language:

"But if it were true, and it were fairly presented to us, that the defendant was the owner of the glass of intoxicating liquor which he sold to Hickey at the time that the state of Iowa first imposed an absolute prohibition on the sale of such liquors, then we can see that two very grave questions would arise, namely: Whether this would be a statute depriving him of his property without due process of law; and, *secondly,* whether, if it were so, it would be so far a violation of the fourteenth amendment in that regard as would call for judicial action by this court."

In the same case, in a concurring opinion, Justice BRADLEY said:

"The law, therefore, was not an invasion of property existing at the date of its passage, and the question of depriving a person of property without due process of law does not arise. No one has ever doubted that a legislature may prohibit the vending of articles deemed injurious to the safety of society, provided it does not interfere with vested rights of property. When such rights stand in the way of the public good, they can be removed by awarding compensation to the owner."

And Justice FIELD adds these words:

"I have no doubt of the power of the state to regulate the sale of intoxicating liquors when such regulation does not amount to the destruction of the right of property in them. The right of property in an article involves the power to sell and dispose of such articles, as well as to use and enjoy it. Any act which declares that the owner shall neither sell it, nor dispose of it, nor use and enjoy it, confiscates it, depriving him of his property without due process of law. Against such arbitrary legislation by any state the fourteenth amendment affords protection."

In the subsequent case of *Beer Co.* v. *Massachusetts,* 97 U. S. 25, the court thus refers to this matter:

"If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by an incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the state. We do not mean to say that property actually in existence, and in which the right of the owner has become vested, may be taken for the public good without compensation; but we infer that the liquor in this case, as in the case of *Bartemeyer* v. *Iowa*, was not in existence when the liquor law of Massachusetts was passed."

In the light of this declaration of the supreme court, that when a man owns, with the unrestricted right to use or sell, a glass of liquor,—mere personal property which, without injury or depreciation in value, can be carried outside the jurisdiction of the state,—legislation of a state prohibiting its sale, and to that extent only diminishing its value, presents a grave question under the fourteenth amendment; the further positive assertion of one of the justices that such legislation is void under that amendment; and a still further intimation of the court in a later case that vested rights of property cannot be destroyed for the public good without compensation,—it would seem a contemptuous disregard by a subordinate tribunal of the judgments of its superior for me to hold that legislation of a state, destroying the value by prohibiting the use of property which cannot be moved, and in whose use the owner had prior thereto an absolute and unrestricted title, is clearly not in conflict with that amendment, and presents absolutely no question for the cognizance and judgment of the federal tribunals.

But I am not content to leave this case upon these authoritative suggestions of the supreme court. As a new matter, it is clear to me that there is a federal question giving right of removal. And here I assert these propositions:

*First.* Debarring a man, by express prohibition, from the use of his property for the sake of the public, is a taking of private property for public uses. It is the power to use, and not the mere title, which gives value to property. Give a man the fee-simple title to a flour-mill, coupled with an absolute prohibition on its use, and of what value is it to him? In the most common and ordinary case of taking private property for public uses,—the condemnation of the right of way for a railroad,—the title is not divested. The owner still retains the fee-simple, and he is only debarred from the use. When the railroad abandons the use, he retakes it. In the leading case of *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, which was a case where land was overflowed in consequence of the erection of a dam, the supreme court thus disposes of this matter:

"It would be a very curious and unsatisfactory result, if, in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrains from the absolute conversion of real

property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private rights under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

In the case of *Munn* v. *Illinois*, 94 U. S. 141, Mr. Justice FIELD uses this language:

"All that is beneficial in property arises from its use, and the fruits of that use; and whatever deprives a person of them, deprives him of all that is desirable or valuable in the title and possession. If the constitutional guaranty extends no further than to prevent a deprivation of title and possession, and allows a deprivation of use, and the fruits of that use, it does not merit the encomiums it has received."

I meet here the common argument that, when private property is taken for public use, there is always a transfer of the use from one party to another; that here the use is not transferred, but only forbidden; and that this deprivation of the use is only one of the consequential injuries resulting from a change of policy on the part of the state for which no compensation or redress is allowed. It is *damnum absque injuria*. The argument is not sound. As a matter of fact, in condemnation cases, seldom is the particular use to which the property has been put transferred. Almost always that use is destroyed in order that another may be acquired. The farmer surrenders a part of his farm to the railroad company, not that the company may continue its use for farming purposes, but that the public may acquire the benefit in another direction. So, where land is flowed by a mill-dam. And thus is it generally. Here the use is taken away solely and directly for the benefit of the public. For no other reason, and upon no other ground, could it be disturbed. Of course, in this, as in other cases, some use remains to the owner; but here, as elsewhere, the use which is of special value is taken from him for the benefit of the public; and this is not a consequential, but a direct result. It is not that the profits of his manufacture are reduced by reason of a prohibition upon sales. The law speaks to him by direct command, and says, "Stop your manufacturing." It is idle to talk of consequential results and injuries when the law, in direct language, forbids the use of the premises for a brewery.

I assert, *secondly*, that natural equity, as well as constitutional guaranty, forbids such a taking of private property for the public good without compensation. In the case of *State* v. *Mugler*, 29 Kan. 252, this question was presented to the supreme court of Kansas, and, as a member of that court, I then expressed the same opinion. I am aware that my brethren differed with me, and that the court held that the state constitution carried no such prohibition. In view of that decision I shall have little to say in respect to the guaranties in

the state constitution. I may, however, be permitted to say, and I do it with the highest respect for the members of that court, and with the utmost deference to its opinions and judgments, that in the light of the frequent discussions of the question since that decision, and the more I have reflected thereon, the more profoundly am I convinced that the guaranties of safety and protection to private property contained within our state constitution forbid that any man should be thus despoiled of that which gives value to his property for the sake of the public good, without first receiving compensation for that which is taken from him.

Turning to the opinions of other courts, I find strong indorsement of the proposition I have asserted. In the case of *Lake View* v. *Rose Hill Cemetery Co.*, 70 Ill. 191, the court says:

"We are unwilling to concede the existence of an indefinable power, superior to the constitution, that may be invoked whenever the legislature may deem the public exigency may require it, by which a party may be capriciously deprived of his property or its use without compensation, whether such property consists of franchises or tangible forms of property."

The constitution of New Jersey contains no such guaranty as ours, yet the supreme court of that state, in *Sinnickson* v. *Johnson*, 17 N. J. Law, 129, declares "that this power to take private property reaches back of all constitutional provision, and it seems to have been a settled principle of universal law that the right to compensation is an incident to the exercise of that power; that the one is inseparably connected with the other; that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle."

The constitution of New York was similarly deficient, and yet, in *Gardner* v. *Newburgh*, 2 Johns. Ch. 162, Chancellor KENT granted an injunction to prevent the trustees of Newburgh from diverting the water of a certain stream flowing over plaintiff's land from its usual course, because the act of the legislature which authorized it had made no provision for compensating the plaintiff for the injury thus done to his land. After citing several continental jurists on this right of eminent domain, he says that, while they admit that private property may be taken for public uses when public necessity or utility requires, they all lay it down as a clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified; and he adds that the principles and practice of the English government are equally explicit on this point.

Were similar action taken by the state in respect to other industries, I can but think the vigor of constitutional guaranties would seem clearer. In my own city is a large manufacturing establishment, in which hundreds of thousands of dollars have been invested for the making of glucose. This is an inferior kind of sugar, and in the opinion of some a deleterious article. Yet the industry is legal, the manufacture not forbidden. Suppose the next legislature should

believe that glucose was injurious to the public health, and forbid its manufacture, could the wheels of that manufactory be stayed, and the value of that investment be destroyed, without compensation? Take, also, the illustration of playing cards, which, by reason of their use for gambling purposes, are, in the judgment of many good people, a bane to society. If a factory for their manufacture was established, when, as now, a perfectly legal industry, would the owner hold his investment subject to the opinions of perhaps a temporary majority? Or, take a still stronger illustration. This is a corn-growing state, yet wheat also is raised abundantly, and many flour-mills exist. Suppose the legislature should determine that the best interests of the state would be promoted by stopping the growing of wheat, and increasing the crop of corn, and to that end should prohibit the milling of flour, must the owners, without compensation, abandon their milling and sacrifice their investment? Does not natural justice, as well as constitutional guaranty, compel compensation as a condition to such sacrifice? Yet who can state what the law will recognize as a legal distinction between those cases and this. Of course, it will be said that no legislature would ever think of such extreme and unreasonable action. But the question for courts to determine is not what is likely to be done, but what can be done.

*Thirdly.* I affirm that, no matter what legislative enactments may be had, what forms of procedure, judicial or otherwise, may be prescribed, there is not "due process of law" if the plain purpose and inevitable result is the spoliation of private property for the benefit of the public without compensation. It is a mistake to say that the forms of law alone constitute "due process." No complete and perfect definition of the phrase "due process of law" has yet been given. The most familiar, and one for ordinary cases sufficiently accurate, is that given by Daniel Webster in the celebrated *Dartmouth College Case,*—the "law of the land" being substantially equivalent to "due process of law,"—as follows: "By the law of the land is meant the general law, which hears before it condemns, which proceeds upon inquiry, and renders judgment only upon trial." But, as said by Mr. Justice MILLER in *Davidson* v. *New Orleans*, 96 U. S. 104, it is probably better "to leave the meaning to be evolved by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." In the same case Mr. Justice BRADLEY adds these words:

"In judging what is ʻdue process of law,' respect must be had to the cause and object of the taking,—whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these; and; if found to be suitable or admissible in the special case, it will be adjudged to be ʻdue process of law,' but if found to be arbitrary, oppressive, and unjust, it may be declared to be not ʻdue process of law.'"

In *Murray's Lessee* v. *Hoboken L. & I. Co.*, 18 How. 276, the supreme court thus limits the meaning of the phrase:

"The constitution contains no description of these processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative, as well as on the executive and judicial, powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will."

Now, in the case at bar, while judicial proceedings are prescribed, yet the spoliation is the direct command of the legislature, and the judicial proceedings are only the machinery to execute that command. No discretion is left to the courts. The legislature has in terms said to defendants, "Stop your use of your brewery," and has directed the courts to enforce that command. There is nothing but mere machinery between the legislative edict and an unused valueless manufacture. As well might the executive as the courts be charged with the enforcement of this command. Such a command, no matter how enforced, operative to deprive a citizen of the value of his property without compensation, is, in the language of Mr. Justice BRADLEY, *supra*, "arbitrary, oppressive, and unjust," and therefore should be "declared to be not due process of law."

*Fourthly*, and as a necessary consequence of the preceding. Legislation which operates upon the defendants as does this is in conflict with the fourteenth amendment, and, as to them, void. At least, it presents a question arising under such amendment, as to which they are entitled to the opinion and judgment of the federal courts. As the amount in controversy is unquestionably in excess of $500, the case is a removable one.

In view of what has hitherto fallen from my pen in other cases, it may be unnecessary to add anything further; yet, to guard against any possible misapprehension, as well as to indicate that my views as expressed upon other questions have not changed, let me say that I do not in the least question the power of the state to absolutely prohibit the manufacture of beer, or doubt that such prohibition is potential as against any one proposing in the future to engage in such manufacture. Any one thus engaging does so at his peril, and cannot invoke the protection of the fourteenth amendment, or demand the consideration and judgment of the federal courts. All that I hold is that "property," within the meaning of that amendment, includes both the title and the right to use; that, when the right to use in a given way is vested in a citizen, it cannot be taken from him for the public good without compensation. Beyond any doubt, the state can prohibit defendants from continuing their business of brewing, but before it can do so it must pay the value of the property destroyed.

Nothing that I have said in this opinion is to be taken as bearing on the question of the sale of beer, or the power of the state over that. Counsel claimed that the right to manufacture, without the right to sell, was a barren right. Whatever limitations may exist in this state,

the markets of the world are open, and, with such markets, the right to manufacture is far from a barren right.

Other questions were discussed by counsel at great length and with great ability. I have not noticed them in this opinion, already quite lengthy, because this question is in the case, cannot be ignored, and justifies a removal.

The motion to remand will be overruled.

One thing more I may be excused for referring to. In the course of the various arguments that have been made to me in this state, and the sister state of Iowa, on the question of removals to the federal courts of proceedings to enforce their prohibitory laws, it has more than once been intimated that jurisdiction in the federal courts of such proceedings meant the nullification of those laws. There could be no greater mistake. The judges of those courts are citizens of these states,—as interested as any citizens in the good name of their states, the enforcement of their laws, and the sobriety of their citizens. Experience has shown that those courts enforce laws as strictly as any, are as little disposed to tolerate trifling or evasion of their orders, and generally punish with a severer hand. If it should so happen that, by the judgment of the supreme court of the United States,—the ultimate tribunal in this nation,—it should be determined that in this or any kindred case the zeal for temperance of the good people of this state has led them to infringe upon sacred and protected rights of property, I cannot doubt that they will gladly hasten to make that compensation which shall be found just. Indeed, it is a truth ever to be borne in mind, and never more so than in times of deep feeling and determined effort, that they who are striving to lift society up to the plane of a higher and purer life should see to it that every act and every step is attended by absolute justice. I commend this to the thoughtful consideration and judgment of the good people of my state,—a state in whose past I glory, and in whose future I believe.

### NOTE.

In Weil v. Calhoun, 25 Fed. Rep. 865, a bill was filed in the United States circuit court for the Northern district of Georgia, for the purpose of testing the Georgia local option and prohibition law. The plaintiffs alleged, among other things, that the act was unconstitutional, because it would render wholly worthless the stock, fixtures, etc., of the brewery, and seriously interfere with the property, business, and vested interests of the complainants. The court say:

"The great complaint of this bill is that by this law the complainants are deprived of their property, and injured in their business, etc. Nothing is better settled, by a large number of decisions of the supreme court of the United States, than that such losses and such damages are not a good objection to a law. The states must have power to legislate for purposes of good order, the preservation of the public health, and a thousand other objects, and it is an every-day event that some man's property is made less valuable—perhaps worthless—by the operation of laws passed by the legislature for the public good. Professions in which men make money, and devote their whole time, are declared illegal, and are broken up and destroyed, very much to the hurt and pecuniary loss of the persons concerned, and they have no redress. I allude now to the profession of the gambler. So, too, so vastly profitable a business as a lottery, even though protected by a legislative grant, has been broken up by a law prohibiting its exercise, and its property and business dissipated to the winds without any remedy. So, of the oleomargarine manufactory; and so of a hundred different investments, made

under laws not prohibiting them, yet rendered valueless or far less valuable by means of the operation of laws passed by the legislature for the public good, as it supposed. This whole subject of the liquor traffic, and investments precisely like those of the complainants broken up or largely crippled by prohibitory laws, has been a fruitful source of discussion before the courts, and they are all now agreed that such rights and properties as the complainants assert they are about to have injured or destroyed if this law be declared of force are not protected by the constitution of the United States. Passenger Cases, 7 How. 504; Beer Co. v. Massachusetts, 97 U. S. 25; Slaughter-House Cases, 16 Wall. 129; Stone v. Mississippi, 101 U. S. 814. This question has been before the supreme court of the United States, the court of the last resort in cases of this kindt and that court uniformly and clearly held that rights of the character here set up mus, yield, however costly and devastating may be the evil, to the will of the legislature in its passage of laws in their judgment for the public good. It is one of the risks that every man takes in entering a business or making an investment, and he cannot complain."